IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

DEMEATRI DE'SEAN DICKEY,

     Plaintiff,

v.                                    Civ. No. 24-1287 GBW/JMR

CITY OF ALBUQUERQUE, *et al.*,

     Defendants.

**MEMORANDUM OPINION AND ORDER**

     THIS MATTER is before the Court on Plaintiff's Motion for Summary Judgment Seeking Declaratory Relief, Permanent Injunctive Relief, or in the Alternative, Preliminary Injunctive Relief (*doc. 30*) and Defendants' Motion for Summary Judgment on the Basis of Qualified Immunity, *Inter Alia* (*doc. 49*).

**I.    Background**

     Plaintiff filed this action in the Second Judicial District Court on October 25, 2024. *Doc. 1-1.* The case was removed on December 23, 2024. *Doc. 1.* The claims arise out of Plaintiff's arrest on February 11, 2024, in downtown Albuquerque, New Mexico. Plaintiff filed the operative First Amended Verified Complaint on February 13, 2025, alleging federal and state claims against Defendants City of Albuquerque ("City"), Chief Harold Medina, Jose Luis Gomez, Desiray Maez, Leah Acata, Nicholas Dickerson Crawford, and Thomas Vigil. *Doc. 10.* On June 12, 2025, the Court granted the parties'

joint motion to dismiss the claims against Defendants Maez, Vigil, and Acata.  *Doc. 34*.

The parties' cross-motions for summary judgment and Plaintiff's alternative motion for

a preliminary injunction are now before the Court.  *Docs. 30*, *49*.

## II.    Undisputed Material Facts

The Court finds the following facts are material and undisputed for purposes of

these motions:

1.      On February 11, 2024, Plaintiff was enjoying a night out in downtown

Albuquerque.  DUMF 1.[1]

2.      At approximately 2:00 a.m., Officer Jose Gomez was in uniform and on patrol

near a parking lot at 3rd Street and Central Ave ("the parking lot").  DUMF 2, 3.

3.      The parking lot is owned by Two Hundred Central LLC c/o William B. Keleher.

PUMF 12.

4.      At approximately 2:47 a.m., Plaintiff returned to his car in the parking lot.

DUMF 6.

5.      Officer Gomez observed Plaintiff start the vehicle while sitting in the driver's

seat.  DUMF 7.

---

[1] "DUMF" refers to Defendants' Undisputed Material Facts (*doc. 49* at 6–10), and "PUMF" refers
to Plaintiffs' Undisputed Material Facts (*doc. 30* at 2–6).  Where the Court cites exclusively to one of the
parties' UMFs, it does so pursuant to Rule 56(e)(2), because the UMF in question was not specifically
disputed.  *See* Fed. R. Civ. P. 56(e)(2).  Where the Court cites to evidence in the record, it does so pursuant
to Rule 56(c)(3), which permits consideration of "other materials in the record."  Fed. R. Civ. P. 56(c)(3).

6.   Officer Gomez walked toward Plaintiff's vehicle and Plaintiff rolled down his window a crack.  DUMF 8.

7.   Officer Gomez introduced himself and asked Plaintiff to lower his window. DUMF 9.

8.   Plaintiff rolled down the window and said, "Yeah what's going on."  DUMF 10.

9.   Officer Gomez told Plaintiff that he just wanted to make sure he could drive and asked him if he had had anything to drink at the bars.  DUMF 11.

10.   Plaintiff stated that he had "a little bit" at "the Library."  DUMF 12.

11.   "The Library" is a bar located on Central Ave. in downtown Albuquerque. DUMF 13.

12.   Officer Gomez observed a black Glock handgun on the driver's side door in plain view.  DUMF 15.

13.   Officer Gomez asked Plaintiff, "Do you mind stepping out of the vehicle for me." DUMF 16.

14.   As Plaintiff released his seatbelt and began opening the door, Officer Gomez asked Plaintiff not to reach for anything and assisted with opening the door.  DUMF 17.

15.   Plaintiff stepped out of the car and Officer Gomez asked him to step toward the back of the car.  DUMF 18.

16.     Plaintiff asked, "What did I do?" and Officer Gomez responded: "So, you admitted to me that you were drinking at the bars, right? You admitted that to me, right?  I see a gun in your car."  Video Exhibit[2] at 2:02, PUMF 15, DUMF 19.

17.     Plaintiff informed Officer Gomez that he had the paperwork in his glove box.  PUMF 16.

18.     Officer Gomez responded: "Yeah that's fine man, but it's a gun-free zone, can't be drinking and having a gun on you or in your car."  Video Exhibit at 2:20, PUMF 17, DUMF 20.

19.     Plaintiff was placed in handcuffs and read his *Miranda* warnings.  DUMF 21.

20.     Neither Officer Gomez nor Officer Crawford breathalyzed Plaintiff or conducted any field sobriety tests.  PUMF 20, 21, 22, 23.

21.     A criminal complaint was filed against Plaintiff, charging him with negligent use of a deadly weapon in violation of NMSA § 30-07-04.  DUMF 24, *doc. 49-2*.

22.     Plaintiff's vehicle was towed, impounded, and then searched pursuant to a search warrant.  PUMF 25, DUMF 25.

23.     Plaintiff's Glock 20 Gen-4 10mm pistol with a magazine containing 16 rounds of ammunition was seized and placed in APD Evidence.  DUMF 25.

---

[2] "Video Exhibit," used herein, refers to the body worn camera footage attached as Plaintiff's Exhibit C and Defendants' Exhibit 2.

4

24.    On April 1, 2024, Plaintiff pled guilty to Negligent Use of a Firearm in the Bernalillo County Metropolitan Court.  *Doc. 49-4*, Case No. T-4-CR-2024-000839.

25.    Plaintiff's sentence was deferred for 120 days "on the condition of unsupervised probation with the following special conditions: No violations of the law."  *Id*.

26.    On August 8, 2024, the criminal case against Plaintiff was dismissed with prejudice.  *Doc. 59-1*, Case No. T-4-CR-2024-000839.

### III.    Legal Standards

A.    <u>Summary Judgment</u>

Under Federal Rule of Civil Procedure 56(a), this Court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the initial burden of showing "that there is an absence of evidence to support the nonmoving party's case."  *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Once the movant meets this burden, the non-moving party is required to designate specific facts showing that "there are . . . genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *see also Celotex*, 477 U.S. at 324.  "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way.  An issue of fact is 'material' if

under the substantive law it is essential to the proper disposition of the claim." *Thom v. Bristol Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (internal citations omitted).

In applying this standard, the Court must draw all "reasonable inferences" in favor of the non-moving party. *Penry v. Fed. Home Loan Bank*, 155 F.3d 1257, 1261 (10th Cir. 1998). Summary judgment is appropriate only "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

B.    Preliminary Injunction

Federal Rule of Civil Procedure 65(a) authorizes the district court to issue preliminary injunctive relief. Preliminary injunctions are "an extraordinary remedy, the exception rather than the rule." *Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019) (quoting *Free the Nipple—Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 797 (10th Cir. 2019)). The moving party must show that "(1) they are substantially likely to succeed on the merits of their claims, (2) they will suffer irreparable harm if the injunction is denied, (3) their threatened injury without the injunction outweighs any harm to the party opposing the injunction, and (4) the injunction, if issued, is not adverse to the public interest." *Harmon v. City of Norman*, 981 F.3d 1141, 1146 (10th Cir. 2020) (citation omitted). "'[B]ecause a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is

likely before the other requirements' will be considered." *First Western Capital Mgmt.*

*Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017) (quoting *Dominion Video Satellite, Inc.*

*v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004)).  The district court has

"broad" discretion in determining whether to grant a preliminary injunction, and "a

strong showing of abuse must be made" to reverse its ruling.  *FTC v. Accusearch, Inc.*,

570 F.3d 1187, 1201 (10th Cir. 2009) (quoting *United States v. W. T. Grant Co.*, 345 U.S.

629, 633 (1953)).

C.    Qualified Immunity

Qualified immunity "shields officials from civil liability so long as their conduct

does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known." *Estate of Taylor v. Salt Lake City*, 16 F.4th 744,

757 (10th Cir. 2021) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11, (2015)).  "When a

defendant raises a claim of qualified immunity, the burden shifts to the plaintiff to show

the defendant is not entitled to immunity." *Roska ex rel. Roska v. Sneddon*, 437 F.3d 964,

971 (10th Cir. 2006).  A plaintiff can overcome the presumption of immunity "only by

showing that (1) the officers' alleged conduct violated a constitutional right, and (2) it

was clearly established at the time of the violation, such that every reasonable official

would have understood[] that such conduct constituted a violation of that right."

*Taylor*, 16 F.4th at 757 (quoting *Reavis v. Frost*, 967 F.3d 978, 984 (10th Cir. 2020)).  The

court decides which of the two prongs to address first.  *Pearson v. Callahan*, 555 U.S. 223,

236 (2009).  To show that a right is clearly established, "the plaintiff must point to 'a

Supreme Court or Tenth Circuit decision on point, or the clearly established weight of

authority from other courts must have found the law to be as the plaintiff maintains.'"

*Callahan v. Unif. Gov't of Wyandotte Cty.*, 806 F.3d 1022, 1027 (10th Cir. 2015) (quoting

*Estate of Booker v. Gomez*, 745 F.3d 405, 427 (10th Cir. 2014)).

## IV.    Analysis

On summary judgment, Plaintiff seeks a declaration that the City's "Downtown

Gun Restriction Zone" (DGRZ) is "unconstitutional on its face and as applied" and

requests a permanent injunction or, in the alternative, a preliminary injunction

preventing the City from enforcing the DGRZ.[3]  *Doc. 30* at 1.  Defendants move for

summary judgment on all claims.  *Doc. 49.*

### A.    The "Downtown Gun Restriction Zone"

Counts I and II of the amended complaint are based on the alleged "DGRZ," an

area in which the City unlawfully detains and arrests individuals "merely because of

the presence of a firearm" and "regardless of whether the possession of said firearms

violates any state or federal law."  *Doc. 10* at ¶¶ 53, 59.  The term "DGRZ" originates

from an article published on the City's website on May 24, 2023, titled "APD Ramps Up

Downtown Gun Enforcement Downtown," which states that "[u]nder the federal Gun-

---

[3] Plaintiff's motion does not specify which of his claims would be resolved, or partially resolved, by the proposed injunctions.  *See generally doc. 10.*  However, the Court construes the motion as seeking summary judgment on Counts I, II, V, and VI of the complaint.

Free School Zones Act, firearms are prohibited in school zones to include in or on the grounds of a public, parochial or private school, or within 1,000 feet from the grounds." City of Albuquerque, *APD Ramps Up Downtown Gun Enforcement Downtown*, https://www.cabq.gov/police/news/apd-ramps-up-downtown-gun-enforcement-downtown (last visited Jan. 14, 2026). The article includes the following quote from Chief Medina: "We are using existing federal law to target gun crimes in downtown Albuquerque." *Id*. It also includes a map of the "Downtown Gun Restriction Zones," or "School Buffer Zones," which are drawn 1,000 feet around each school in downtown Albuquerque, covering much of the downtown area. *See id*.

Counts I and II of the amended complaint assert "facial and as-applied" challenges to the DGRZ against the City and Chief Medina. *Doc. 10* at ¶¶ 60–89. Count I asserts a violation of the Fourth Amendment right to be free from unreasonable searches and seizures because the DGRZ "instruct[s] officers that they can detain individuals without reasonable suspicion of a crime for non-criminal conduct, such as possessing a firearm in their vehicle in the Downtown Buffer Zones." *Id*. at ¶ 66. Count II asserts a violation of the Second Amendment because the DGRZ "instruct[s] officers that they can seize and retain individuals' firearms despite lacking probable cause and charges being dismissed." *Id*. at ¶ 82. Relevant to both counts, Plaintiff alleges that he was unlawfully detained, arrested, and prosecuted as a result of the DGRZ. *Id*. at ¶¶ 63, 79.

Defendants move for summary judgment on the basis that there is no evidence of a policy or custom permitting officers to detain or arrest individuals for lawful possession of a firearm. *Doc. 49* at 11–14. In other words, although the term "Downtown Gun Restriction Zones" appeared in the City's May 2023 press release, Defendants deny the existence of a "DGRZ" in the sense that Plaintiff has defined it. Defendants attach affidavits from Officer Gomez and Commander Jose Sanchez stating that the City and Chief Medina have no policy or custom of "instructing officers that they can detain or arrest individuals for possessing firearms in their vehicle anywhere downtown, in the absence of criminal conduct." *Doc. 49-1* at ¶ 21; *doc. 49-6* at ¶ 3. Both Officer Gomez and Commander Sanchez state that they are aware of the Downtown Gun Restriction Zone map, and that it reflects areas "where guns are prohibited pursuant to federal law" but does not "allow[] officers to unlawfully seize and/or arrest individuals." *Doc. 49-1* at ¶ 22; *doc. 49-6* at ¶ 4. Defendants also attach Albuquerque Police Department SOP 2-71, titled "Search and Seizure Without a Warrant," which provides that officers "shall only make arrests, searches and seizures which they know or should know are lawful[.]" *Doc. 49-5* at 4.

Plaintiff contends that the DGRZ depicted in the map imposes restrictions beyond existing federal law. The Gun-Free School Zones Act of 1990, as amended,[4]

---

[4] In *United States v. Lopez*, 514 U.S. 549, 551 (1995), the Supreme Court held that the Gun-Free School Zones Act of 1990 exceed Congressional authority and was unconstitutional because it contained no "requirement that the possession be connected in any way to interstate commerce." Congress

makes it unlawful "for any individual knowingly to possess a firearm that has moved in or that otherwise affects interstate or foreign commerce at a place that the individual knows, or has reasonable cause to believe, is a school zone."  18 U.S.C. § 922(q)(2)(A). The term "school zone" is defined to include "within a distance of 1,000 feet from the grounds of a public, parochial or private school."  *Id*. § 921(a)(26)(B).  Plaintiff does not challenge the constitutionality of § 922(q).  However, Plaintiff correctly notes that the prohibition does not extend "to the possession of a firearm . . . on private property not part of school grounds."  *Id*. § 922(q)(2)(B)(i).  Plaintiff argues that the DGRZ prohibits possession of firearms on private property within the "School Buffer Zones" depicted on the map, and therefore differs from the federal statute.  As evidence Plaintiff cites the press release, arguing that "the map . . . does not distinguish between public and private property, nor do Defendants do so in their press release."  *Doc. 40* at 8.  In addition, Plaintiff argues Officer Gomez's statement during his arrest that "it's a gun-free zone" shows the City was enforcing the restriction on firearm possession on private property.[5]  *See doc. 59* at 16.  Plaintiff claims he was "detained, arrested, and prosecuted" "[a]s a result of . . . merely possessing a firearm in his vehicle in the Downtown Buffer

---

subsequently amended § 922(q) to remedy this defect.  *See* Omnibus Consolidated Appropriations Act of 1997, Pub. L. 104-208, § 657, 110 Stat. 3009, 3009-369–71 (1996).  "Since then, courts have upheld the amended statute."  *Huff v. Telecheck Servs.*, 923 F.3d 458, 466 (6th Cir. 2019) (citing *United States v. Dorsey*, 418 F.3d 1038, 1046 (9th Cir. 2005); *United States v. Danks*, 221 F.3d 1037, 1039 (8th Cir. 1999)); *see also United States v. Benally*, 233 F. App'x 864, 870 (10th Cir. 2007) (affirming defendant's conviction under § 922(q)(2)(A)).

[5] Defendants do not dispute that the parking lot was "private property" within the meaning of § 922(q).  *See doc. 38* at 10–13; *doc. 63* at 10–11.

Zones." *Doc. 10* at ¶ 63.  He therefore concludes that the "DGRZ" impermissibly "prohibits an ordinary, law-abiding citizen from possessing a handgun in their downtown home for self-defense . . . [or] carrying a handgun outside their downtown home for self-defense." *Doc. 30* at 11–12.

The Court finds Plaintiff has not established a genuine dispute of material fact with respect to the existence of a policy or custom permitting officers to detain and arrest individuals for possessing a gun on private property, in the absence of any violation of state or federal law.  Although Plaintiff contends the map in the press release does not distinguish between public and private property, the article clearly states that the City is "using *existing federal law* to target gun crimes in downtown Albuquerque"; references the Gun-Free School Zones Act by name; and clarifies that the map represents areas "where *federal firearms restrictions* apply."  City of Albuquerque, *APD Ramps Up Downtown Gun Enforcement Downtown*, https://www.cabq.gov/police/news/apd-ramps-up-downtown-gun-enforcement-downtown (last visited Jan. 14, 2026) (emphasis added).  In short, the press release does *not* evidence the establishment of a "gun-free zone" beyond what is prohibited by § 922(q).  Nor does the video footage show that Plaintiff was detained, arrested, or prosecuted based on a policy-driven misapprehension that § 922(q) applies on private property, or based solely on his possession of a firearm.  Rather, it is clear throughout the video that Plaintiff was arrested because of his perceived intoxication coupled with

possession of a firearm, a violation of New Mexico state law.  The initial encounter was

obviously unrelated to Plaintiff's firearm, as Officer Gomez was not aware of its

existence until he approached the vehicle.  After Officer Gomez saw the firearm and

asked Plaintiff to step out of the vehicle, they had the following exchange:

> Plaintiff: What did I do?
>
> Office Gomez: So, you admitted to me that you were drinking at the bars, right?
> You admitted that to me, right?  I see a gun in your car.
>
> Plaintiff: Yeah, it's . . . I have the papers in my glove box.
>
> Officer Gomez: Yeah that's fine man, but it's a gun-free zone, can't be drinking
> and having a gun on you or in your car.

Video Exhibit at 2:02–2:27.  Officer Crawford provided a similar explanation several

minutes later:

> Officer Crawford: So there's a firearm in the car.
>
> Plaintiff: Which is registered to me.
>
> Officer Crawford: I understand it may be registered, but when you
> consume alcohol, okay, that's negligent use of a deadly weapon, okay,
> because you have a deadly weapon and you consumed alcohol, okay.  So
> you'll be charged with negligent use of a deadly weapon, which is a
> misdemeanor, okay.  So downtown, we work very hard to prevent that.
> We do not want people coming down here with guns, this is a gun-free
> zone.

Video Exhibit at 6:36–7:01.  When Plaintiff again asked for an explanation in the police

vehicle, Office Gomez stated: "We're trying to reduce gun violence in the downtown

area.  Alcohol, let me speak, alcohol and guns do not make a good combination."  Video Exhibit at 14:10–14:24.

Despite the officers' use of the phrase "gun-free zone," it was clear throughout the interaction that Plaintiff was arrested because Officer Gomez believed he was intoxicated and had a firearm, not merely because he had a firearm in a particular area or "zone."  This understanding is consistent with Officer Gomez's affidavit,[6] which states that he investigated and arrested Plaintiff "because [Plaintiff] had had trouble walking and was in a vehicle, in the driver's seat, with it running and then because he smelled of alcohol and I saw a gun in his vehicle, in plain view."  *Doc. 49-1* at ¶17.  It is likewise consistent with the criminal complaint, which lists the crime as "Negligent use of a deadly weapon" in violation of NMSA § 30-07-04.  *Doc. 49-2*.  The affidavits of both Officer Gomez and Commander Sanchez specifically deny the existence of any "policy or custom of instructing officers that they can detain or arrest individuals for possessing firearms in their vehicles anywhere downtown, in the absence of criminal conduct."  *Doc. 49-1* at ¶ 21; *doc. 49-6* at ¶ 3.  In short, based on the evidence before the Court, no rational trier of fact could find that Plaintiff was detained, arrested, or prosecuted

---

[6] Plaintiff argues that Defendants' affidavits are "self-serving" and therefore insufficient to establish facts on summary judgment.  *Doc. 59* at 17.  The Court disagrees.  "To survive summary judgment, [the] nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient."  *Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1030–31 (10th Cir. 2022) (quoting *Skrzypczak v. Roman Catholic Diocese*, 611 F.3d 1238, 1244 (10th Cir. 2010)).  Testimony by the officers on the relevant matters in their affidavits would be admissible in evidence at trial.  Therefore, the affidavits are therefore properly considered.

because of a zone-based policy or custom that prohibits otherwise lawful firearm possession. Nor has Plaintiff proffered sufficient evidence for a rational fact-finder to conclude that any such policy or custom exists. Plaintiff's motion is therefore denied, and Defendants' motion is granted as to Counts I and II of the amended complaint.

B.    _Heck_ Bar

Defendants argue that Plaintiff's Fourth Amendment claims are barred by _Heck v. Humphrey_, 512 U.S. 477 (1994), because a judgment in Plaintiff's favor would necessarily invalidate his conviction for negligent use of a firearm. _See doc. 49_ at 14–18. Under _Heck_,

> when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.

512 U.S. at 487. A conviction or sentence is "invalidated" if it has been "reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." _Id_. Plaintiff argues that because the charges against him were dismissed, the prosecution "ended without a conviction" and _Heck_'s favorable-termination rule is satisfied. _See doc. 59_ at 3–5.

But the Court need not decide whether Plaintiff's criminal case terminated favorably. The Tenth Circuit has adopted the plurality opinion in _Spencer v. Kenna_, 523

U.S. 1, 21 (1988) (Souter, J., concurring), that "a petitioner who has no available remedy in habeas, through no lack of diligence on his part, is not barred by *Heck* from pursuing a § 1983 claim." *Cohen v. Longshore*, 621 F.3d 1311, 1317 (10th Cir. 2010). With respect to individuals who have completed their sentences, the *Spencer* plurality reasoned that

> a former prisoner, no longer "in custody," may bring a § 1983 action establishing the unconstitutionality of a conviction or confinement without being bound to satisfy a favorable-termination requirement that it would be impossible as a matter of law for him to satisfy. Thus, the answer to Spencer's argument that his habeas claims cannot be moot because *Heck* bars him from relief under § 1983 is that *Heck* has no such effect.

*Spencer*, 523 U.S. at 21. In other words, under the law in this circuit, *Heck* is inapplicable to Plaintiff's § 1983 claims unless he is still "in custody" for purposes of § 2254.

The Court finds Plaintiff is not in custody and has no available remedy in habeas. "The federal habeas corpus statute requires that the applicant must be 'in custody' when the application for habeas corpus is filed." *Carafas v. LaVallee*, 391 U.S. 234, 238 (1968). This requirement is jurisdictional. *Mays v. Dinwiddie*, 580 F.3d 1136, 1139 (10th Cir. 2009). Nothing in the record suggests that Plaintiff is presently serving a sentence; on the contrary, it is undisputed that the charges against him were dismissed on August 8, 2024. *Doc. 59-1*. Plaintiff's civil case was not filed until October 25, 2024, after the criminal case was dismissed. *Doc. 1-1*. A petitioner has a remedy in habeas only if he "suffers . . . present restraint from a conviction," and the general rule is that the custody requirement cannot be satisfied when the sentence imposed for the conviction is "fully

expired." *Maleng v. Cook*, 490 U.S. 488, 491 (1989).  While an individual need not be "subject to immediate physical imprisonment" to seek relief under § 2254, he must be "subject to restraints not shared by the public generally that significantly confine and restrain freedom." *Mays*, 580 F.3d at 1139 (citing *Lehman v. Lycoming County Children's Servs. Agency*, 458 U.S. 502, 510 (1982)).  For example, a petitioner may be "in custody" if he is on parole, serving a suspended or stayed sentence, or committed to a mental institution.  *Id*. (citing *Jones v. Cunningham*, 371 U.S. 236, 241–43 (1963); *McVeigh v. Smith*, 872 F.2d 725, 727 (6th Cir. 1989); *Sammons v. Rodgers*, 785 F.2d 1343, 1345 (5th Cir. 1986); *Duncan v. Walker*, 533 U.S. 167, 176 (2001)).  The requirement is not satisfied where the petitioner merely suffers "collateral consequences" of the conviction.[7]  *Maleng*, 490 U.S. at 492; *see*, *e.g.*, *Clark v. Okla.*, 789 F. App'x 680, 683–84 (10th Cir. 2019) (rejecting arguments that petitioner was "in custody" because his conviction was used to enhance a subsequent sentence and required him to register as a sex offender).

In this case, Plaintiff is not serving a sentence, did not file a habeas petition while serving a sentence, and has not demonstrated restraints sufficient to render him "in

---

[7] In applying this rule, the jurisdictional "in-custody" requirement must be "distinguish[ed] . . . from issues concerning whether a habeas action is moot." *Mann v. Norton*, 1992 U.S. App. LEXIS 11524, at *4 n.2 (10th Cir. May 13, 1992) (citing *D.S.A. v. Circuit Court Branch 1*, 942 F.2d 1143, 1145 n.2 (7th Cir. 1991), *cert. denied*, 112 S. Ct. 1196 (1992)).  A petitioner who has *already* filed for habeas "can maintain his habeas action following his release from custody if he can identify 'collateral consequences' constituting 'disabilities or burdens [which] may flow from petitioner's conviction.'" *Lorance v. Commandant*, 13 F.4th 1150, 1153 (10th Cir. 2021) (quoting *Carafas*, 391 U.S. at 237–38) (alteration in original).  The rule differs for petitioners who do not file until after release.

custody" for purposes of § 2254.  Therefore, the Court finds Plaintiff has no available

habeas remedy and *Heck* does not bar his claims.

C.  Qualified Immunity

Count III of the amended complaint alleges a claim of unlawful detention and

arrest against all defendants, in violation of the Fourth Amendment.  *Doc. 10* at ¶¶ 90–

104.  Count IV alleges a claim of malicious prosecution.  *Id*. at ¶¶ 105–16.  Plaintiff

claims there was neither reasonable suspicion to detain him nor probable cause for his

arrest.  *Id*. at ¶¶ 93, 95.  Defendants Gomez and Crawford assert a defense of qualified

immunity.[8]  *See doc. 49* at 18–24.

1.     *Fourth Amendment Standard*

"The Supreme Court has identified three types of police/citizen encounters:

consensual encounters, investigative stops, and arrests."  *Oliver v. Woods*, 209 F.3d 1179,

1186 (10th Cir. 2000) (citing *United States v. Cooper*, 733 F.2d 1360, 1363 (10th Cir. 1984),

*cert. denied*, 467 U.S. 1255 (1984)).  Consensual encounters are not seizures under the

Fourth Amendment; officers may "approach people and ask questions" without

suspicion of wrongdoing.  *Id*. (citing *Florida v. Royer*, 460 U.S. 491, 497–98 (1983)).  An

---

[8] Officer Crawford also argues he should be dismissed from the suit because he was not involved in the relevant decision-making.  *See doc. 49* at 18–19.  Because, as explained herein, the Court finds both officers are entitled to qualified immunity, the Court does not reach the question of Officer Crawford's level of involvement.

encounter is consensual only if a reasonable person would believe he is "free to leave."

*See Royer*, 460 U.S. at 502 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).

An investigative detention, where police "stop and briefly detain a person for investigative purposes," must be supported by "a particularized and objective basis for suspecting the particular person stopped of criminal activity," i.e., reasonable suspicion. *Oliver*, 209 F.3d at 1186 (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). "Although an officer's reliance on a mere 'hunch' is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (citations omitted).

Finally, an arrest is "characterized by highly intrusive or lengthy search or detention" and is "justified only when there is probable cause to believe that a person has committed or is committing a crime." *United States v. Cooper*, 733 F.2d 1360, 1363 (10th Cir. 1984) (citing *Dunaway v. New York*, 442 U.S. 200 (1979)). "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *Oliver*, 209 F.3d at 1186 (quoting *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995)). Probable cause does not "require the suspect's guilt to be more likely true than false," but it does require "something more than a bare suspicion." *Stonecipher v. Valles*, 759 F.3d 1134,

1141 (10th Cir. 2014) (quoting *Kerns v. Bader*, 663 F.3d 1173, 1188 (10th Cir. 2011))

(internal quotation marks omitted).

In the context of qualified immunity, an officer need only show he had

"arguable" reasonable suspicion or probable cause.  *See A.M. ex rel. F.M. v. Holmes*, 830

F.3d 1123, 1140 (10th Cir. 2016) ("[I]n the § 1983 qualified-immunity context, an officer

may be mistaken about whether he possesses actual probable cause to effect an arrest,

so long as the officer's mistake is reasonable—viz., so long as he possesses arguable

probable cause."); *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1207 (10th Cir. 2008) (an

officer is "entitled to qualified immunity" if he had "arguable reasonable suspicion" to

detain the plaintiff).

> 2.    *NMSA § 30-7-4*

Under New Mexico law, "[n]egligent use of a deadly weapon consists of . . .

carrying a firearm while under the influence of an intoxicant or narcotic."  NMSA § 30-

7-4(A)(2).  The New Mexico Court of Appeals has defined "carrying a firearm" in § 30-

7-4(A)(2) with reference to NMSA § 30-7-1: "being armed with a deadly weapon by

having it on the person, or in close proximity thereto, so that the weapon is readily

accessible for use."  *State v. Rivera*, 853 P.2d 126, 130 (N.M. Ct. App. 1993); *see also United

States v. Nelson*, Crim. No. 00-410 JP, 2000 U.S. Dist. LEXIS 24307, at *17 (D.N.M. Aug. 8,

2000).  Likewise, although § 30-7-4 does not define "under the influence," the state court

has taken "guidance from authority interpreting that phrase in the context of motor

vehicle operation," where a person is under the influence if their ability to handle a vehicle safely is "lessened to the slightest degree." *Rivera*, 853 P.2d at 132 (quoting *State v. Copeland*, 727 P.2d 1342, 1349 (N.M. Ct. App. 1986), *cert. denied*, 726 P.2d 856 (1986)); *see also State v. Neal*, 176 P.3d 330, 338 (N.M. Ct. App. 2007) ("The statute gives notice, according to the plain meaning of the word 'influence,' that the Legislature intends to criminalize a condition less than intoxication, but 'influenced' to any degree by alcohol, no matter how slight."). Therefore, "[a] person of ordinary intelligence would understand what conduct is prohibited by the statute: having a firearm nearby, readily capable of being put into action or service, while under the influence of alcohol." *Id.* at 130.

3. *Relevant Facts*

As an initial matter, the Court must determine which facts to consider in determining whether Plaintiff's arrest violated clearly established law. Officer Gomez's affidavit states that at approximately 2:47 a.m., he "observed [Plaintiff] having difficulty walking" and "observed [Plaintiff] start the vehicle and sit in the driver's seat as the vehicle was running." *Doc. 49-1* at ¶ 7. He then approached the vehicle and asked Plaintiff to roll down his window. *Id*. at ¶ 8. When he asked Plaintiff if he had had anything to drink at the bars, Plaintiff stated that he had "a little bit" at "the Library." *Id*. at ¶ 9. Officer Gomez could smell alcohol on Plaintiff's breath through the open window and could see a handgun on the driver's side door in plain view. *Id*. at ¶ 10.

At that point, Officer Gomez asked Plaintiff to step out of the vehicle, placed him in handcuffs, and arrested him for negligent use of a deadly weapon. *Id.* at ¶ 11, 13.

Plaintiff argues that the evidence of his impairment (i.e., difficulty walking, odor of alcohol) relies on hearsay and should be disregarded under Fed. R. Civ. P. 56(c)(2). *Doc. 59* at 3, 16. But these facts are drawn from Officer Gomez's affidavit and based on his personal observations. *See doc. 49-1.* Undoubtedly, Officer Gomez's testimony on these points would be admissible at trial. It is therefore well established that they may be considered on summary judgment. *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."); *Johnson v. Weld Cty.*, 594 F.3d 1202, 1210 (10th Cir. 2010) ("Rule 56 permits parties at summary judgment to produce their evidence by means of affidavit[.]").

In addition, Plaintiff asserts that these facts are disputed. *Doc. 59* at 15. But Plaintiff has presented no contrary evidence. "A party asserting that a fact . . . is genuinely disputed must support the assertion by [] citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations[,] admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A); *see also Johnson v. City of Cheyenne*, 99 F.4th 1206, 1217 (10th Cir. 2024) ("[A]t summary judgment . . . the

plaintiff's version of the facts must find support in the record." (quotation omitted)).

While Plaintiff's verified complaint "may be treated as an affidavit for purposes of

summary judgment if it satisfies the standards for affidavits set out in Rule 56,"[9] *Vette v.*

*Sanders*, 989 F.3d 1154, 1163 (10th Cir. 2021) (quotation omitted), it does not contradict

Officer Gomez's observation that Plaintiff was having trouble walking toward his

vehicle before the encounter began.  It alleges only that "throughout the interaction"

Plaintiff was "not . . . stumbling," and that Defendants did not "ask [Plaintiff] whether

he had any physical conditions which might affect his gait."  *Doc. 10* at ¶¶ 34, 38.

Likewise, no allegation in the amended complaint contradicts Officer Gomez's

observation that Plaintiff's breath smelled of alcohol.  Plaintiff asserts that "the video

evidence contradicts [Officer Gomez's] account that Plaintiff was unable to walk,"[10] *doc.*

*59* at 15, but the video footage does not show Plaintiff walking toward his vehicle.  The

Court therefore finds these facts are not genuinely disputed.

Finally, Plaintiff argues that Officer Gomez "did not have the required DUI

certification and training to be able to determine that Plaintiff was intoxicated."  *Id.*

---

[9] In order to be considered on summary judgment, a verified complaint "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  *Vette v. Sanders*, 989 F.3d 1154, 1163 (10th Cir. 2021) (quoting Fed. R. Civ. P. 56(c)(4)).  The amended complaint appears to meet this standard insofar as it relates to matters on which Plaintiff has personal knowledge, and the Court treats it as an affidavit for purposes of this motion.

[10] Plaintiff also argues that the video evidence "contradicts his account that Plaintiff . . . was slurring his speech."  *Doc. 59* at 15.  There is no mention in Officer Gomez's affidavit of slurred speech.  *See doc. 49-1.*

Officer Gomez's affidavit states that he was trained in DWI enforcement in the

Albuquerque Police Academy. *Doc. 49-1* at ¶ 2. It is unclear what additional

certification would be required to recognize the ordinary signs of intoxication, and

Plaintiff cites no authority.

In the absence of contradictory evidence, the Court finds these material facts

undisputed and must determine whether, based on these facts, Defendants are entitled

to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

4.    *Clearly Established Law*

Plaintiff contends that his detention, arrest, and prosecution violated clearly

established law because there was insufficient evidence from which to conclude he was

impaired, a necessary element of NMSA § 30-7-4. *See doc. 59* at 15, 17–18. Plaintiff does

not dispute that he was "carrying a firearm" within the meaning of § 30-7-4(A)(2).

However, he argues that an arrest "without objective impairment evidence" violates the

Fourth Amendment,[11] highlighting the absence of "field tests, breath testing, or reliable

evidence." *Doc. 59* at 17, 18.

---

[11] Plaintiff also reprises his argument that a "zone-based" arrest on private property was unconstitutional. *See doc. 59* at 16. This argument is unavailing for the reasons addressed with respect to Counts I and II above. Moreover, "an arresting officer's 'subjective reason for making [an] arrest need not be the criminal offense as to which the known facts provide probable cause.'" *Rife v. Okla. Dep't of Pub. Safety*, 854 F.3d 637, 646 (10th Cir. 2017) (quoting *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)) (alteration in original). In other words, even if—arguendo—Officer Gomez's decision to detain and arrest Plaintiff had been based on a mistaken understanding of federal gun law or department policy, the relevant inquiry under the Fourth Amendment would remain whether there was probable cause to believe Plaintiff violated NMSA § 30-7-4.

It is Plaintiff's burden to show that Defendants are not entitled to qualified immunity—and, more specifically, to identify cases showing that Defendants' actions violated clearly established law. *See Gutierrez v. Cobos*, 841 F.3d 895, 901–03 (10th Cir. 2016). Although Plaintiff's brief cites several cases in support, none are factually similar. *See Dist. of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (officers were entitled to qualified immunity where they made an "entirely reasonable inference" that partygoers were using a vacant house without permission, based on the partygoers' behavior and the condition of the house); *Kerns v. Bader*, 663 F.3d 1173, 1188–89 (10th Cir. 2011) (defendants had probable cause to arrest the plaintiff for shooting down a helicopter based on his suspicious and inconsistent statements, military background, and evasion of police); *Cortez v. McCauley*, 478 F.3d 1108, 1118 (10th Cir. 2007) (holding it "should have been patently obvious to any reasonable law enforcement official" that "unsubstantiated double-hearsay originating from a two-year-old, standing alone, does not give rise to probable cause"). From these cases, Plaintiff argues it is clearly established that "probable cause requires particularized facts supporting each element of the offense and that officers cannot rely on guesswork or inference-stacking when exculpatory circumstances are obvious." *Doc. 59* at 18. Because an element of the offense is being "under the influence," § 30-7-4(A)(2), he argues there was no probable cause for his arrest.

Plaintiff's cited authority does not meet the "high degree of specificity" required to show that a right is clearly established, and which is "especially important in the Fourth Amendment context." *See Wesby*, 583 U.S. at 63 (quoting *Mullenix*, 577 U.S. at 13). None address the question of whether an officer who observes similar physical signs of intoxication, but does not conduct field sobriety or breathalyzer tests, has probable cause to arrest under a statute analogous to NMSA § 30-7-4(A)(2). Although the § 1983 plaintiff need not identify a case "directly on point," the "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Consequently, "[t]he general proposition . . . that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." *Id.* at 742. It is necessary to "identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *Wesby*, 583 U.S. at 64 (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)).

The Court conducted its own review of cases involving similar circumstances. In several cases, the Tenth Circuit has found probable cause—or at least "arguable" probable cause—where plaintiffs exhibited physical signs of impairment, and either failed or refused field sobriety testing. *See Rife v. Okla. Dep't of Pub. Safety*, 854 F.3d 637, 643–46, (10th Cir. 2017) (finding probable cause to arrest plaintiff for public intoxication where he had just been in a motorcycle accident, could not remember basic information,

had slurred speech, and failed field tests); *Wilder v. Turner*, 490 F.3d 810, 811, 815 (10th Cir. 2007) (probable cause to arrest for DUI due to plaintiff's odor of alcohol, pinkish and watery eyes, flushed face, slow speech, slow hand movement, and refusal to participate in a field sobriety test); *Summers v. Utah*, 927 F.2d 1165, 1166 (10th Cir. 1991) (probable cause to arrest for DUI due to "plaintiff's operation of his vehicle, the officer's scent of alcohol emanating from the vehicle and plaintiff's refusal to take a field sobriety test"). These cases do not establish whether probable cause would have existed in the absence of field sobriety testing. In *Wilder*, the court held that the officer's observations of indicia of alcohol consumption gave rise to "an objectively reasonable and articulable suspicion of criminal activity to justify detaining Plaintiff for further investigation"; from there, "probable cause developed when twice Plaintiff refused to participate in a field sobriety test." 490 F.3d at 815. *Wilder* might, arguably, be read to suggest that no probable cause existed until the plaintiff refused field sobriety testing. But in *Burke v. City of Okla. City*, 2025 U.S. App. LEXIS 12282, at *14–15 (10th Cir. May 20, 2025), the Tenth Circuit explicitly rejected the plaintiff's *Wilder*-based argument that "indicia of alcohol consumption (slurred speech, unsteady, bloodshot eyes, odor of alcohol) . . . is not legally sufficient for probable cause, instead, probable cause develops through 'some type of field sobriety or other test.'" Rather, the court held that based solely on the plaintiff's "outward manifestations of intoxication"—slurred speech, unsteadiness, bloodshot eyes, and smell of alcohol—there was probable cause to arrest him for public

intoxication.  *Id*. at *16.  And in *Schmerber v. Cal.*, 384 U.S. 757, 768–69 (1966), the Supreme Court held there "was plainly probable cause" to arrest petitioner for driving under the influence where, following a car accident, the officer "smelled liquor on petitioner's breath" and observed that his "eyes were bloodshot, watery, sort of a glassy appearance."

New Mexico law supports the conclusion that probable cause may exist on the basis of an officer's observations of signs of impairment.  Although federal law controls the qualified immunity analysis, *see Wilder*, 490 F.3d at 814, courts look to state law for the elements of the particular offense.  In *Vondrak*, the court held that the plaintiff's admission to "drinking one beer several hours earlier," without any observable evidence of impairment, created reasonable suspicion to conduct field sobriety tests. 535 F.3d at 1207.  The court noted it was a "close case," but that the "reasonable suspicion analysis is buttressed by New Mexico law, which proscribes driving while impaired to the slightest degree":

> The sheer breadth of § 66-8-102(A)—as compared to, for instance, the statute proscribing a person from driving with a blood-alcohol content of greater than 0.08—provides support for [defendant's] argument that she had reasonable suspicion that Vondrak violated New Mexico law.

*Id*. at 1207–08 (internal citation omitted); *see also Burke*, 2025 U.S. App. LEXIS 12282, at *15 ("*Wilder* thus does not speak to the probable cause required for a public intoxication arrest in Oklahoma, as the elements for the Colorado DUI statute and Oklahoma's public intoxication statute differ.").  The degree of intoxication required by § 30-7-4 is

borrowed from, and functionally identical to, the "slightest degree" standard of § 66-8-

102. *See Rivera*, 853 P.2d at 132. New Mexico courts have found in several cases that

observable evidence of impairment, without testing, establishes probable cause to

determine an individual is "under the influence." *See State v. Hernandez*, 619 P.2d 570,

571 (N.M. Ct. App. 1980) (holding there was probable cause to arrest where the

defendant had driven a car several feet in the officer's presence, and "the officer had

smelled alcohol and noted defendant's slurred speech"); *State v. Trujillo*, 510 P.2d 1079,

1082 (N.M. Ct. App. 1973) (holding there was probable cause to arrest the defendant for

DWI following a car accident because he had "a strong smell of liquor on his breath"

and there was a half-full bottle of wine in the car); *State v. Peebles*, 2007 N.M. App.

Unpub. LEXIS 53, at *2 (N.M. Ct. App. Sept. 13, 2007) ("In this case the officer's

observations, including Defendant's position behind the wheel of a vehicle, with the

engine running, with an open container beside him, with bloodshot watery eyes,

slurring his speech, smelling strongly of alcohol, and having difficulty maintaining his

balance, established probable cause."). In *Peebles*, the court specifically noted that

although the officer waited to make the arrest until receiving the field sobriety test

results, "[it] does not indicate that the field sobriety tests were a prerequisite to the

existence of probable cause." 2007 N.M. App. Unpub. LEXIS 53, at *3–4.

  In light of the Supreme Court and Tenth Circuit precedent, the requisite "high

degree of specificity," *Wesby*, 583 U.S. at 63 (quoting *Mullenix*, 577 U.S. at 13), and the

available guidance from New Mexico courts, the Court finds that Plaintiff's detention, arrest, and prosecution did not violate his clearly established constitutional rights. The Court acknowledges that probable cause is debatable under these facts and that *Wilder*, in particular, might arguably suggest field sobriety or other testing was required to develop probable cause. But in determining qualified immunity, "[i]t is not enough that the rule is *suggested* by then-existing precedent." *Wesby*, 583 U.S. at 63 (emphasis added). None of the cases identified by Plaintiff, Defendants, or the Court have determined, under similar factual circumstances, that an officer violated a plaintiff's clearly established Fourth Amendment rights. Nor does the Court find this is "the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances," *Wesby*, 583 U.S. at 64 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)). On the contrary, the determination of reasonable suspicion and probable cause under these facts rests on fine distinctions and logical inferences that do not place the constitutional question "beyond debate," *al-Kidd*, 563 U.S. at 741. The Court therefore finds Officer Gomez did not violate Plaintiff's clearly established rights when he approached him for further investigation, based on his observation that Plaintiff had difficulty walking back to his car and was sitting in the driver's seat of a running vehicle.[12] *See doc. 49-1* at ¶ 7.

---

[12] Whether Officer Gomez's first contact with Plaintiff—asking him to roll down the window and if he had been drinking—constituted an investigative detention is debatable. For purposes of this motion only, the Court assumes that it did, and that reasonable suspicion was therefore required.

Likewise, the case law does not show he violated Plaintiff's clearly established rights when he concluded Plaintiff was "under the influence" and arrested him based on Plaintiff's difficulty walking, the smell of alcohol on Plaintiff's breath, and Plaintiff's admission that he had been drinking at a nearby bar. *Id*. at ¶¶ 8–10. Because the right at issue was not clearly established, the Court does not reach the question whether officers actually had reasonable suspicion or probable cause to detain or arrest Plaintiff. *See Pearson*, 555 U.S. at 236.

Because Plaintiff's claim of malicious prosecution depends on the probable cause determination, it must likewise fail. *Thompson v. Clark*, 596 U.S. 36, 43 (2022) ("[T]he gravamen of the Fourth Amendment claim for malicious prosecution . . . is the wrongful initiation of charges without probable cause."). The individual Defendants are entitled to qualified immunity and Defendants' motion for summary judgment is granted on Counts III and IV.

D.    Fourth Amendment *Monell* Claims

Counts III and IV of the amended complaint allege that the City and Chief Medina are liable for violating the Fourth Amendment because they "have a policy/custom of detaining, arresting, and prosecuting individuals with firearms charges despite not having reasonable suspicion or probable cause to support the detentions, arrests, or charges." *Doc. 10* at ¶¶ 98, 111. Under *Monell v. New York Dep't of Social Servs.*, 436 U.S. 658, 690–91 (1978), a municipality may be held liable pursuant to §

31

1983 "if it executes an unconstitutional policy or custom, or a facially constitutional policy that causes a constitutional violation." *Finch v. Rapp*, 38 F.4th 1234, 1244 (10th Cir. 2022). "A core principle of *Monell* liability is that municipal entities are liable only for their own actions and not vicariously liable for the actions of their employees." *Crowson v. Washington Cty.*, 983 F.3d 1166, 1191 (10th Cir. 2020).

As discussed above with respect to Counts I and II, Plaintiff has produced no evidence of the alleged unconstitutional policy or custom. Defendants have produced uncontroverted evidence, in the form of affidavits, that no such policy or custom exists. *See doc. 49-1* at ¶ 21 (Officer Gomez's affidavit); *doc. 49-6* at ¶ 3 (Commander Sanchez's affidavit). The Court therefore grants summary judgment on the municipal liability claims in Counts III and IV.

E.    Racial Discrimination Claims

Count VII of the amended complaint alleges a claim under the Fourteenth Amendment's Equal Protection Clause because Defendants Gomez and Crawford "failed to investigate or prosecute similarly situated individuals and only investigated and prosecuted Plaintiff due to his race." *Doc. 10* at ¶ 153. Count VIII alleges a *Monell* claim against the City and Chief Medina for a "custom of engaging in racially biased prosecution without sufficient evidence or regard for due process" and failure to train. *Id*. at ¶¶ 155–56. Count X alleges a claim against the City under Title VI of the Civil Rights Act, 42 U.S.C. § 2000d, *et seq.*, because the City "provided unequal and

discriminatory prosecution services by relying on racially biased witnesses and

proceeding with charges without sufficient evidence." *Id*. at ¶ 176.

Plaintiff has proffered no evidence to support his claims of racial discrimination.

He makes no supporting legal arguments in his response brief. *See generally doc. 59*. In

response to Defendants' material facts, Plaintiff argues only that the City's position

relies on "its own affiants" and that "selective enforcement and equal protection are fact

questions inappropriate for resolution on competing affidavits alone." *Id*. at 8. But this

is not a case of competing affidavits, because there is no competing evidence. The

verified complaint contains no factual allegations of racial bias that are based on

Plaintiff's personal knowledge. While Plaintiff alleges that prior to arresting Plaintiff,

Officers Gomez and Crawford "had interactions with at least three members of the

public who were intoxicated," that these individuals "were allowed to drive away," and

that they "were not members of [Plaintiff's] protected class, i.e., African Americans,"

*doc. 10* at ¶ 45–47, Plaintiff has failed to produce evidence of these interactions on

summary judgment. Officer Gomez's affidavit states:

> While on patrol that morning, I contacted several individuals, who
> appeared to be of Caucasian, Latino, and African-American descent, but
> all of these encounters were consensual and I did not develop reasonable
> suspicion to detain those individuals or probable cause to arrest them as
> they did not display evidence of intoxication coupled with an intent to
> drive or possession of a deadly weapon.

*Doc. 49-1* at ¶ 5.[13]  Officer Gomez also states: "My investigation into [Plaintiff] and his arrest had nothing to do with his race."  Doc. 49-1 at ¶ 17.  Both Officer Gomez and Commander Sanchez state in their affidavits that "[n]either the City nor Chief Medina have or have had a custom of racially profiling individuals for prosecution."  Id. at ¶ 21; *doc. 49-6* at ¶ 3.

 "[B]ald assertions of racist motivations on the part of [an arresting officer] do not render his conduct unconstitutional."  *Jackson v. Loftis*, 189 F. App'x 775, 780 (10th Cir. 2006) (quoting *Conrod v. Davis*, 120 F.3d 92, 96 (8th Cir. 1997)).  To establish an equal protection claim, the plaintiff must show there was "selective enforcement of the law based on considerations such as race."  *Whren v. United States*, 517 U.S. 806, 813 (1996).  Defendants have produced evidence that no selective enforcement took place, and Plaintiff has produced no competing evidence.  Summary judgment is therefore granted for Defendants on Counts VII, VIII, and X.

F.    Supplemental Jurisdiction over State Claims

Plaintiff argues that if the Court grants summary judgment on all federal claims, it "must" remand the remaining state law claims to state court.[14]  *Doc. 59* at 18.  Defendants oppose.  *See doc. 63* at 11–12.

---

[13] Plaintiff purports to dispute this fact because it is "immaterial" and "supported only by self-serving affidavit/RMS paperwork."  *Doc. 59* at 5.  It is clearly material since Plaintiff's racial discrimination claims are premised on selective, race-based enforcement of state law.  Plaintiff's argument that the affidavits are "self-serving" has already been addressed.

[14] Plaintiff's citation to *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22 (2025), is inapposite.  *Royal Canin* resolved the question of whether a federal court may exercise supplemental jurisdiction after

"Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction if 'the district court has dismissed all claims over which it has original jurisdiction.'" *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011). "When all federal claims have been dismissed, the court may, *and usually should*, decline to exercise jurisdiction over any remaining state claims." *Smith v. City of Enid ex rel. Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998) (emphasis added); *see also Barnett v. Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C*, 956 F.3d 1228, 1238 (10th Cir. 2020) ("The Supreme Court has encouraged the practice of dismissing state claims or remanding them to state court when the federal claims to which they are supplemental have dropped out before trial."). Nonetheless, the decision to exercise supplemental jurisdiction over any remaining claims is within the district court's discretion. *Nielander v. Bd. of Cty. Comm'rs*, 582 F.3d 1155, 1172 (10th Cir. 2009) (citing *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1139 (10th Cir. 2004)).

Resolution of Plaintiff's state law claims involves factual and legal considerations distinct from his federal claims. The Court finds that the remaining issues of New Mexico law are best determined by New Mexico's courts. Accordingly, the Court declines to exercise supplemental jurisdiction and will remand the remaining claims.

---

the plaintiff amends the complaint to remove all federal claims. *See id*. at 30 ("When a plaintiff amends her complaint following her suit's removal, a federal court's jurisdiction depends on what the new complaint says."). This is quite different from the situation, encountered here, where both federal and state claims are presented to the Court for summary judgment.

## V.    Conclusion

For the foregoing reasons, Plaintiff's Motion for Summary Judgment Seeking

Declaratory Relief, Permanent Injunctive Relief, or in the Alternative, Preliminary

Injunctive Relief (*doc. 30*) is DENIED.

Defendants' Motion for Summary Judgment on the Basis of Qualified Immunity,

*Inter Alia* (*doc. 49*) is GRANTED as to Counts I, II, III, IV, VII, VIII, and X of the First

Amended Verified Complaint.

The remaining state law claims are hereby REMANDED to the Second Judicial

District Court.

**IT IS SO ORDERED.**

_____
GREGORY B. WORMUTH
CHIEF UNITED STATES MAGISTRATE JUDGE
**Presiding by Consent**